UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PAUL M. MCDONOUGH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PORTLAND, | ) | |
| | ) | 2:15-cv-00153-JDL |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NON-RESERVED TAXI | ) | |
| GROUP, INC., | ) | |
| | ) | |
| Intervenor. | ) | |

**ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

Paul M. McDonough operates a taxi in the City of Portland (the "City"). ECF No. 53 at 2, ¶ 2. He is Caucasian and was born in America. *Id.*, ¶ 1. McDonough holds a City-issued taxi permit, but that permit does not allow him to collect passengers at the Portland International Jetport who have not made prior reservations. Only drivers who hold a City-issued non-reserved Jetport taxicab permit ("NRT") may pick up passengers without a reservation at the Jetport. ECF No. 3-17 at 1. All of the 43 current non-reserved permits are held by individuals who are immigrants from Somalia or Iran. McDonough claims that the City has unlawfully discriminated against him and "all other non-black, non-immigrant Portland taxicab drivers[,]" *id.* at 2, by "intentionally perpetuat[ing] this racial and national-origin monopoly[,]" ECF No. 52 at 2. The City disagrees, arguing that all of

the current holders of non-reserved taxi permits applied for the permits prior to June 1, 2008, "when the system was entirely open and the City granted permits to any city-licensed taxi business that applied for one and was otherwise eligible[,]" ECF No. 54 at 1-2, and that its "rules are facially neutral and were not made, amended or applied with any reference to race or national origin[,]" *id.* at 1.

Both McDonough and the City have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  In addition, the Non-Reserved Taxi Group, Inc., ("NRTG") an incorporated association of individuals who currently hold non-reserved permits, has been permitted to intervene in this case, s*ee* ECF No. 20, and has also filed a summary judgment motion, ECF No. 56.  Because I conclude that McDonough has failed to demonstrate that he has standing to bring his claim, a requirement of Article III, Section 2 of the U.S. Constitution, I grant summary judgment in favor of the City.

## I.  FACTUAL BACKGROUND

The City regulates ground transportation, including taxicabs, at the Jetport pursuant to its Ground Transportation Rules and Regulations.  ECF No. 65 at 1, ¶ 1. In 1995, the City began issuing NRT permits to City-licensed taxi businesses.  *Id.* at 2, ¶ 3.  An NRT permit allows the cab to queue at the Jetport and await fares.  *Id.* ¶ 4.  Any City-licensed taxi driver who does not have an NRT permit, but does have a so-called "reserved access permit," may drop off and pick up passengers at the Jetport on a pre-arranged basis but may not queue at the Jetport.  *Id.* at 2-3, ¶ 7.  Until June 1, 2008, the NRT system was entirely open, and NRT permits were available to any City-licensed taxi business that applied and was found to be eligible.  *Id.* at 3, ¶ 12.

## A.    2008 Developments

In 2008, the number of NRT permittees had grown to 54 and the Jetport was experiencing issues of overcrowding in the area where the NRT cabs queue.  ECF No. 63 at 4, ¶ 15; ECF No. 65 at 4, ¶ 14.  In response, the City stopped issuing new NRT permits on June 1, 2008, but allowed the existing permit holders to continue to renew their permits ("2008 Moratorium").  ECF No. 63 at 4, ¶ 16; ECF No. 65 at 4, ¶ 15.  Of the 54 licensees, one or two were Caucasian, and the remainder were immigrants from Somalia or Iran.  ECF No. 53 at 6, ¶¶ 19-21, 71.  No new NRT permits have been issued since then.  ECF No. 65 at 5, ¶ 16.

McDonough does not claim that the City's adoption of the 2008 Moratorium was racially motivated, nor does he claim that its adoption violated the Fourteenth Amendment's guarantee of equal protection.  ECF No. 64 at 6.  Rather, he challenges the City's failure to modify that system since its adoption in 2008 so as to perpetuate what he claims is an unlawful "racial monopoly[.]"  *Id.*  As proof, McDonough cites several efforts, beginning in 2009 and ending in 2013, undertaken by city officials to modify the NRT permit program.  Several of the proposals would have either made NRT permits available for new applicants, thus creating an opportunity for McDonough and others to apply for a permit, or transferred all of the NRT permits to a single, private concessionaire, ECF No. 63 at 13, 16-17, which would have left it to the concessionaire to decide which cab drivers would have access to non-reserved passengers at the Jetport, *see id.* at 13-14.

B.    **2009 Developments**

In August 2009 the Jetport's director, Paul Bradbury, proposed that the existing NRT system be abolished in order to address overcrowding issues and improve efficiency, and that a concession be created whereby a single contractor would provide NRT service at the Jetport.  ECF No. 65 at 5, ¶ 17 (citing ECF No. 51-6 at 11-12).  Bradbury advised the City Council's Transportation Committee that the number of non-reserved taxis needed at the airport was "about 30[,]" that the number of current taxi drivers was "about 50[,]" and that the majority of the drivers "are minorities [and a]bout 20 minority taxi drivers [would] not be needed for work at the airport."  ECF No. 63 at 13, ¶ 37.

In email exchanges regarding the 2009 proposal between Bradbury and City Councilor Kevin Donoghue, Donoghue stated that it was clear to him that they were "dealing with an issue with racial impacts[,]" ECF No. 51-12 at 3, and he expressed his concern that if the exclusive contractor proposal was adopted there would be a "significant racial displacement" and that the drivers, now "largely minorities," might "change complexion[,]"  ECF No. 63 at 14 (citing ECF No. 51-12).   On September 24, 2009, Councilor Donoghue sent an email to Gary Wood, the Corporation Counsel, "stating that he was unwilling to support the recommendation of an exclusive taxi concession at the Jetport because of the 'clear racial impacts.'"  *Id.* at 15, ¶ 41 (citing ECF No. 51-14 at 2).  The concession proposal was presented to the City Council "because the Council would have been required to approve any such contract," but it was not ultimately adopted.  ECF No. 65 at 5, ¶18.

C.    **2010 Developments**

In 2010, City officials continued to work on the issue of overcrowding at the Jetport and ultimately decided that potential solutions should be presented to the City Council for input.  *Id.* at 6, ¶ 20.  Although the airport director has rulemaking authority pursuant to Portland, Me., Code § 18-83 (March 15, 2010), Bradbury thought that it made sense to present potential amendments to the Council because the City Manager could disapprove rules posted by the airport director.  *Id.* at ¶ 21. In April 2010, Harris proposed that the City adopt a lottery in which the first 50 applicants drawn would receive NRT permits for a two-year period, and the next 50 applicants drawn would receive NRT permits for the following two-year period.  ECF No. 63 at 16-17, ¶ 46.  This proposal was not adopted, nor was a separate proposal put forth by Ann Freeman, Associate Corporation Counsel, which would have opened up the NRT pool to new applicants.  *Id.* at 17-18, ¶¶ 48, 50-51.  Bradbury testified that the reason the latter proposal was not adopted was because of "concern over the loss of the incumbents' livelihood[.]"  *Id.* at 18-19, ¶ 51.

A separate proposal initiated by Freeman in 2010 was proposed by Bradbury which capped the number of NRT permits at 40, and provided that the reduction from the 50 or 51 NRT permits then issued would be achieved over time by attrition.  ECF No. 65 at 6-8, ¶¶ 22, 23, 25.  It also provided that an open lottery among all interested City-licensed taxi businesses would be held once the number of permits fell below the 40 permit cap.  *Id.* at 7, ¶ 23.

### D.    2012 Developments

Bradbury continued to explore options with respect to the NRT permitting system and held two meetings with interested parties, including NRT permit holders and representatives of other City-licensed taxi businesses in June and October of 2012.  *Id*. at 11, ¶ 30 (citing ECF No. 51-65; ECF No. 51-66).  On October 17, 2012, Bradbury presented a proposal to the City Council's Transportation Committee that would amend the NRT rules to establish a series of elimination lotteries to reduce the NRT permittees to 40 with the resulting permits falling into different renewal categories ranging from 1 to 4 years.  *Id*. at 13-14, ¶¶ 36-37.  Thereafter, openings would be filled by a lottery open to all interested City-licensed taxi businesses resulting in one-year permits renewable for a period of three years. *Id*.  Ultimately, the Committee did not express support for this proposal.  *Id*. at 14, ¶ 39.  Although there were never formal Committee or Council votes on the proposal, Bradbury understood that the Committee was concerned about taking away the livelihoods of the current NRT permittees.  *Id*. at 14-15, ¶ 40.

### E.    2013 Developments

In June 2013 Bradbury proposed and adopted several amendments that provided for:

> a. an elimination lottery among existing NRT permit holders if the number of NRT permittees was not 45 or less as of July 18, 2013;
>
> b. an elimination lottery among existing NRT permittees if the number of NRT renewal applications as of June 1, 2017 exceed[ed] 42; and
>
> c. that if the number of NRT permit holders [was] less than 42 as of June 1, 2017 the City [would] hold an open lottery among any interested city-licensed taxi cab businesses.

6

("2013 Amendment"). *Id.* at 15-16, ¶ 41. The July 18, 2013, elimination lottery was not triggered because the number of NRT permittees had fallen to 45 prior to that date. *Id.* at 16, ¶ 43. There are currently 43 NRT permit holders, each of whom has held his or her permit without interruption at least since June 1, 2008. ECF No. 69 at 8, ¶ 18.

## F.    McDonough's Claims

McDonough contends that the City is aware that all of the NRT cab owners are Somali and Iranian immigrants, and that it has "intentionally perpetuated this racial and national-origin monopoly[,]" ECF No. 52 at 2, by, on the one hand, adopting rules that have the overall effect of protecting the monopoly, and, on the other hand, rejecting proposals that would either replace the monopoly with a single concession or make it possible for all City-licensed cab owners to apply for permits, *id.* at 2-3. He brings claims under 42 U.S.C. § 1983 for a violation of his right to equal protection under the Fourteenth Amendment to the U.S. Constitution (Count III), and under 42 U.S.C. § 1981 for racial discrimination in the making and/or enforcement of contracts (Count IV). ECF No. 52 at 1. As relief, McDonough seeks a permanent injunction "requiring the City, within a reasonable time from the entry of judgment, to conduct a lottery of all eligible taxicab drivers who are interested in obtaining a[n] NRT access permit and to distribute the permits accordingly." *Id.* at 15. He also seeks an injunction requiring the City to amend its rules so as to end "the racial monopoly that

the City created in 2008 and that ensures a fair and equitable distribution of NRT access permits in the future[.]"[1]  *Id.*

## II.  DISCUSSION

The City and the Intervenor assert that McDonough lacks standing to mount his equal protection challenge because he cannot establish that he has suffered or will suffer an injury that would be redressed in this litigation.  ECF No. 54 at 9; ECF No. 61 at 11-12.  McDonough counters that his standing is established by proof that the City, over an eight-year period, denied him equal treatment by its repeated decisions to favor and protect the monopoly of the immigrants who have been the exclusive holders of NRT access permits since 2008.  ECF No. 64 at 2.

The parties have briefed both whether McDonough has standing to bring his claims, as well as the merits of the claims.  Because I conclude that McDonough has failed to demonstrate his standing to bring this action, I decide the case solely on that basis and do not reach the underlying merits.

## A.  Standing Doctrine and Proof of an "Injury in Fact"

The standing doctrine arises under Article III, Section 2, of the Constitution which extends the judicial power of the federal courts to "[c]ases" and "[c]ontroversies."  U.S. Const. art. III, § 2.  Standing requires that a plaintiff demonstrate "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."  *Gladstone Realtors v. Vill.*

---

[1] McDonough represents in his Motion for Summary Judgment (ECF No. 52) that he "is no longer pursuing Count I" of the Amended Complaint (ECF No. 3-17), which is a claim for intentional discrimination under the Maine Human Rights Act, 5 M.R.S.A. § 4551, *et seq.*  ECF No. 52 at 1 n.1.  I previously dismissed Count II of the Amended Complaint on June 16, 2015.  ECF No. 20.  Only Counts III and IV remain in dispute.

*of Bellwood*, 441 U.S. 91, 99 (1979) (citations omitted).  "[T]he judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim."  *Id*. at 99-100.

Standing consists of three elements:  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). An "injury in fact" is one that is "concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id*. at 1548 (citation and internal quotations omitted).

As a plaintiff who challenges a municipal practice as a violation of the Fourteenth Amendment's guarantee of equal protection, McDonough must demonstrate that he has standing to sue.  In *Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993), the Supreme Court considered the standing of a petitioner who brought an equal protection challenge against a city ordinance that gave preference to minority or women-owned businesses when awarding municipal contracts.  The Court recognized that "in the context of a challenge to a set-aside program, the [plaintiff's] 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract."  *Id*. at 666 (citation omitted).

McDonough partially satisfies the injury in fact requirement to the extent that he has been prevented from competing with other taxi drivers for an NRT permit. But because the relief he seeks is a prospective injunction that would bar the City from enforcing the NRT permit moratorium, the City argues, and McDonough does not dispute, that he must also demonstrate that he is "able and ready" to apply for the permit that the City's allegedly discriminatory policy prevents him from seeking. ECF No. 54 at 9 (citing *Donahue v. City of Boston,* 371 F.3d 7, 14 (1st Cir. 2004)); *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (quoting *City of Jacksonville*, 508 U.S. at 666).

*Gratz* involved a class action challenge to the University of Michigan's use of racial preferences in undergraduate admissions as a violation of the Equal Protection Clause.  The Court recognized that the plaintiff's intent "may be relevant to standing in an equal protection challenge." *Gratz*, 539 U.S. at 261.  It concluded that a named plaintiff had demonstrated his intent to apply for admission by showing that he was "'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions.  He therefore [had] standing to seek prospective relief with respect to the University's continued use of race in undergraduate admissions." *Id*. at 262.

## B.    Evidence of McDonough's Ability and Readiness

In asserting that McDonough has failed to show that he is able and ready to apply for an NRT permit if he were to be awarded the injunctive relief that he seeks, the City and Intervenor cite the following excerpt from his deposition testimony in which McDonough, in responding to whether he was able and willing to meet the

requirements for an NRT permit and pay the application fee if he was permitted to apply, indicated that he probably would not pay the $800 fee required for an NRT permit:

> Q.    If there were no cap and you could currently apply for the nonreserved permit, would you be able and willing to meet their requirements and pay the fee?
>
> A.    To spend the $800?  That's a very, very, very -- that's a very accurate thing.  I probably – I probably wouldn't be – I'd want to go there, but it's all relative.  I wouldn't be as inclined to go there now with the – you're talking about if the same number of cabs were allowed there or are we talking about when we used to go there for 12 cabs? See, I don't know.
>
> Q.    I'm talking about everything is the same except you can now apply for a permit?
>
> A.    Okay.  I would be No. 46 instead of 45, right?
>
> Q.    Sure.
>
> A.    Geez, I don't know.  Well, the other thing that I got to keep in mind now, I'm old and I don't know how much longer I'm going to be doing this.  A lot of people think I'm a little younger than I am, which is complimentary to me, but I'm quite old.  So I don't know how much longer I'm going to be doing this.  It's mostly principle.  I know that's a foregone word these days.  Some people don't even know what I mean when I mention that.

ECF No. 51-4 at 26; *see also* ECF No. 54 at 10.

McDonough responds that the City has mischaracterized his testimony by ignoring his post-deposition errata sheet in which he corrected his answer because the answer he gave at the deposition "was rambling and unresponsive[,]" ECF No. 51-4 at 33.  McDonough provided the following corrected answer:

> The only reason I hesitate in answering that question is I am 71 years old, I've driven a cab for 47 years, and I don't know how much longer I'm going to be doing this.  If I am physically able to continue working over

> 50 hours a week, and to change my hours to match when the planes arrive, then I would definitely pay the $800 for an airport access permit.

*Id.*; *see also* ECF No. 65 at 20, ¶ 60.

As a deposed witness, McDonough is permitted to review the transcript of his deposition and make "changes in form or substance" accompanied by a signed statement "listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(B). The City, however, cites the so-called "sham affidavit" doctrine, and argues that McDonough's corrected answer should be disregarded because it contradicts his original answer and does not adequately explain the contradiction. ECF No. 70 at 2-5.

The "sham affidavit" doctrine holds that if a party gives a clear answer to an unambiguous question at his or her deposition, the party cannot create a disputed issue of fact to avoid summary judgment by offering an affidavit that is clearly contradictory to the earlier testimony but does not give a satisfactory explanation of why the testimony is changed. *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) (citations omitted). The doctrine has been held to apply not only to post-deposition affidavits, but also to post-deposition testimonial corrections made by a party pursuant to Rule 30(e)(1)(B). *See* 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2118 (3d ed. 2010). Applied here, however, the doctrine does not support the argument that McDonough's corrected answer should be disregarded.

McDonough was initially asked, "If there were no cap and you could currently apply for the nonreserved permit, would you be able and willing to meet their

requirements and pay the fee?"   ECF No. 51-4 at 26.   His answer was, as he characterizes it, "rambling" and, at least in part, "unresponsive[.]"   *Id.* at 33.   In addition, the core of his initial answer— "I'm quite old[,] . . . I don't know how much longer I'm going to be doing this[, and] [i]t's mostly principle" is consistent with, and not clearly contradicted by his corrected answer.   Therefore, I conclude the "sham affidavit" doctrine does not apply and I do not disregard McDonough's post-deposition correction.   His corrected answer, as set forth in the errata sheet, provides the relevant testimony for purposes of the summary judgment record and the determination of his standing to sue.   Nevertheless, McDonough's corrected testimony does not help him avoid the entry of summary judgment, for reasons that I will now explain.[2]

The City contends that even if McDonough's corrected answer is properly part of the summary judgment record, his answer shows that his willingness to apply for an NRT permit and pay the application fee is "equivocal[.]"   ECF No. 70 at 5.   Thus, the City argues, McDonough has still failed to show that he is able and ready to apply for an NRT permit.   I agree.

In his corrected answer, McDonough qualified his willingness to apply for a permit and pay the $800 fee in three respects: He was (1) uncertain as to how much longer he will continue to drive a cab; (2) concerned about whether he is physically

---

[2]  By so concluding, I do not address the admissibility of his original testimony if this matter were to proceed to trial and the City or Intervenor sought to use the original testimony for impeachment or other purposes.   *See* 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2118 (3d. ed. 2010) (recognizing that a "witness who changes his or her testimony on a material matter between the giving of the deposition and appearance at the trial may be impeached by the former answers").

able to continue to work over 50 hours a week; and (3) not sure as to whether he is willing to change his work hours to match the hours when planes arrive.  *See* ECF No. 51-4 at 33.  While his answer shows that it is possible that he would apply for a permit given the opportunity, it does not establish that it is likely that he would apply.

The First Circuit considered the "able and ready" requirement in *Donahue v. City of Boston*, 371 F.3d 7 (1st Cir. 2004), in which a Caucasian applicant challenged Boston's race conscious police officer hiring program as a violation of equal protection. While the litigation was pending, the plaintiff reached the maximum cut-off age at which applicants were no longer qualified to be hired.  The court concluded that, because he sought prospective relief in the form of an injunction barring the city from applying a minority preference, the plaintiff could not demonstrate that he was "able and ready" to apply for the position and, therefore, was not prevented from doing so by the challenged discriminatory policy.  *Id.* at 14.  Earlier, in *Cotter v. City of Boston*, 323 F.3d 160, 167 (1st Cir. 2003), the Court explained that to show an injury in fact, a plaintiff challenging a municipal race-conscious program as a violation of equal protection must not only show that he or she has been prevented from competing on an equal footing, but also that there is "a likelihood that he will compete for the governmental benefit in question in the future[.]"  *See also In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, 2015 WL 7282543, at *3 (D. N.H. Nov. 16, 2015) ("[A] plaintiff's standing 'depend[s] on whether he [is] likely to suffer future injury' from the alleged misconduct.") (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983)).

Accordingly, to have standing to sue in this case, McDonough must show more than an interest in applying for an NRT permit if this court ordered the City to scrap its existing NRT permit program and to adopt a new program. Rather, McDonough must show that he is sufficiently able and ready to apply for an NRT permit and, therefore, it is *likely* that he would do so. The word "likely," when it is predicative with the "anticipatory *it* as subject and *that*-clause as complement[,] [means] having a high chance of occurring; probable." Oxford English Dictionary, http://www.oed.com/view/Entry/108315?rskey=q96kWW&result=1#eid. That standard is not met here because McDonough's uncertainty regarding his interest in continuing to operate a taxicab, his concern about his physical capacity to perform the job, and his potential unwillingness to change his work hours, reveal that he does not know whether he would seek a permit if given the opportunity to do so.

Because Article III, Section 2 of the Constitution limits the federal courts to deciding actual cases or controversies, "federal courts may exercise power only as a last resort, and as a necessity[.]" *Cotter*, 323 F.3d at 166 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984) (internal quotation marks omitted)). The standing requirement "ensures that plaintiffs have alleged a personal stake in the outcome of the controversy." *Id*. Here, McDonough has not demonstrated that his personal stake in the outcome of this litigation rises to the level required to satisfy the Constitution's standing requirement.

## C.    Intervenor's Motion for Summary Judgment

In its opposition to McDonough's Motion for Summary Judgment (ECF No. 61), the Intervenor also argued that McDonough lacks standing to sue over the NRT

15

permit program.  ECF No. 61 at 11-12.  While the Intervenor and the City are entitled to summary judgment on this basis, I note that the Intervenor focused its own Motion for Summary Judgment on the merits of McDonough's equal protection claim without mentioning the standing issue.  *See* ECF No. 56.  Therefore, I deny the Intervenor's Motion for Summary Judgment as moot.

## III. CONCLUSION

It is **ORDERED** that:

1.  The Plaintiff's Motion for Summary Judgment (ECF No. 52) is **DENIED**.

2.  The City of Portland's Motion for Summary Judgment, (ECF No. 54) is **GRANTED**.    Count I, Count III, and Count IV of McDonough's Amended Complaint (ECF No. 3-17) are **DISMISSED**.

3.  The Intervenor, Non-Reserved Taxi Group, Inc.'s Motion for Summary Judgment (ECF No. 56) is **DENIED AS MOOT**.

**SO ORDERED.**

**Dated this 30th day of June 2016.**

         _____/s/ **Jon D. Levy**_____
            **U.S. DISTRICT JUDGE**